[Cite as *State v. Huber*, 2019-Ohio-3012.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                      :

      Plaintiff-Appellee,                          :

                                      No. 17AP-738

v.                                                 :         (C.P.C. No. 16CR-343)

Phillip M. Edwards,                                :         (REGULAR CALENDAR)

      Defendant-Appellant.                         :

---

D E C I S I O N

Rendered on July 25, 2019

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee. **Argued:** *Steven L. Taylor.*

**On brief:** *Samuel H. Shamansky Co., L.P.A., Samuel H. Shamansky, Donald L. Regensburger, Colin E. Peters*, and *Sara A. Hill*, for appellant. **Argued:** *Donald L. Regensburger.*

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Phillip M. Edwards, appeals from the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding appellant guilty of numerous drug possession offenses and related charges.

I. Procedural History

{¶ 2} A Franklin County Grand Jury returned an eight-count indictment against appellant for: (1) possession of heroin equal to or exceeding 250 grams; (2) possession of cocaine equal to or exceeding 100 grams; (3) aggravated possession of drugs (methamphetamine) equal to or exceeding 100 times the bulk amount; (4) aggravated

possession of drugs (oxycodone) equal to or proceeding the bulk amount; (5) possession of heroin equal to or exceeding five grams; (6) possession of cocaine; (7) failure to comply with an order to signal or stop after commission of a felony; and (8) failure to comply with an order or signal to stop, causing substantial risk of serious physical harm to persons or property. All offenses occurred on the date of appellant's arrest, January 12, 2016, which was the culmination of a police investigation involving informant tips, a period of surveillance, a controlled buy of narcotics, and a vehicular pursuit ending in a minor wreck. Counts 5 and 6 involved small quantities of drugs found on appellant's person and in his car at the time of his arrest. Counts 1 through 4 involved large amounts of drugs seized on the same day after a search of a residence frequented by appellant.

{¶ 3} Appellant initially pled guilty to three counts as part of a plea bargain, but later moved successfully to withdraw his plea. The matter proceeded to a jury trial. During the course of trial, the judge replaced a tardy juror with an alternate. The jury returned guilty verdicts on all counts in the indictment.

{¶ 4} After the jury was discharged, the assistant prosecutor handling the case became aware that on the day the jury deliberated, an evidentiary exhibit comprised of 71 oxycodone pills had gone missing in the interval between the time the prosecutor had checked this and other physical evidence out of the prosecutor's evidence room on the morning of the last day of trial and the time the evidence was returned to the evidence room after the jury had been discharged. At the prosecutor's request, the pills and other drug evidence had been sent back with the jury for examination during deliberations. Appellant's counsel filed a motion for new trial based on the disappearance of the oxycodone pills and the inference that one or more of the jurors were responsible for the disappearance and that such conduct had prejudicially influenced the jury's deliberations. The trial court denied the motion for new trial and imposed an aggregate sentence of 25 years' incarceration.

## II. Assignments of Error

{¶ 5} Appellant appeals and assigns the following five assignments of error for our review:

> [I.] THE DISAPPEARANCE OF EVIDENCE DURING APPELLANT'S TRIAL, AND THE TRIAL COURT'S SUBSEQUENT REFUSAL TO ORDER A NEW TRIAL,

VIOLATED HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

[II.] TRIAL COUNSEL'S PERFORMANCE FELL BELOW THE OBJECTIVE STANDARD OF REASONABLENESS AND CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

[III.] THE TRIAL COURT'S REMOVAL OF JUROR NUMBER 7 CONSTITUTED PLAIN ERROR, PREJUDICED APPELLANT, AND VIOLATED HIS RIGHTS A JURY TRIAL AND DUE PROCESS AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

[IV.] APPELLANT'S CONVICTIONS ON COUNTS ONE THROUGH FOUR WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION.

[V.] APPELLANT WAS DEPRIVED OF A FAIR TRIAL DUE TO THE CUMULATIVE ERRORS OF THE TRIAL COURT IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

## III. Analysis

{¶ 6} We first address appellant's fourth assignment of error, which asserts his convictions on Counts 1 through 4, involving large quantities of drugs that were not on appellant's person at the time of his arrest, were against the manifest weight of the evidence. Appellant, in brief, argues that these drugs, taken from a residence located at 854 Antwerp Road in Whitehall, Franklin County, Ohio, were not proved to be in appellant's possession because the prosecution presented no direct evidence appellant had control over items located at that address, which was not linked to appellant through ownership, utility bills, or vehicle registrations. Appellant argues the evidence demonstrates at most that appellant had access to the residence, but did not exercise control or dominion over the property therein.

{¶ 7}    "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*.' " (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6 Ed.1990).  As the finder of fact, the jury is in the best position to weigh the credibility of testimony by assessing the demeanor of the witness and the manner in which he testifies, his connection or relationship with the parties, and his interest, if any, in the outcome.  The jury can accept all, a part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact.  *State v. McGowan*, 10th Dist. No. 08AP-55, 2008-Ohio-5894, ¶ 13, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 8}    When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Thompkins* at 387.  An appellate court should reverse a conviction as against the manifest weight of the evidence in only the most "exceptional case in which the evidence weighs heavily against the conviction," instances in which the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 9}    Detective Jonathon Earl, of the Whitehall Police Department, testified regarding the investigation that led to appellant's arrest and the circumstances of that arrest and attendant searches.  Detective Earl and his partner, Detective Guy Grinstead, worked in the Whitehall police narcotics unit.  Detective Earl received a tip from a known informant naming appellant as a drug dealer.  Detective Earl then used standard investigative techniques, including stationary and mobile surveillance, to try and ascertain appellant's residence and locations of activity.  Officers discovered that mobile surveillance, while they were initially able to locate appellant at an address in Hilliard, Ohio, was ineffective because appellant frequently adopted erratic and random driving patterns that made him difficult

to follow.  In particular, appellant frequently drove at excessive speeds which made it difficult to maintain contact without making it obvious appellant was under investigation. Eventually, based on a known license plate number, police were able to use the state's license plate reader database ("LPRD") website to circumscribe appellant's driving activities to the Whitehall area.  This investigation disclosed there were several vehicles habitually driven by appellant.  Based on information provided by the informant, the LPRD returned numerous overnight hits for one of appellant's vehicles on Antwerp Road in Whitehall.  Investigating officers eventually focused on the home at 854 Antwerp Road.

{¶ 10}  Renewed contact with the case informant opened the possibility of making a controlled narcotics buy from appellant.  Eventually, a controlled buy was arranged in which the informant would use a middleman to consummate the drug transaction with appellant on January 12, 2016 at a location some two miles from 854 Antwerp Road. Detective Grinstead undertook stationary surveillance of 854 Antwerp Road on the day arranged for the controlled buy, and eventually relocated to the buy location as backup.

{¶ 11}  After the informant consummated the buy using registered money, Detective Earl searched the informant, recovered the purchased substances, and used a mobile test kit to confirm the materials as illegal drugs.  Detective Earl did not specify in his testimony of the nature of the drugs purchased, and because police wished to protect the identity and continuing usefulness of their confidential informant, appellant was not charged with a trafficking offense arising from the buy itself.

{¶ 12} Based on the drugs obtained through the controlled buy, Detective Earl obtained a search warrant for 854 Antwerp Road.  After the controlled buy, police attempted to follow appellant but were unable to do so because of appellant's renewed evasive driving tactics.  Detective Grinstead had returned directly to his surveillance position and reported that appellant returned to 854 Antwerp Road after the buy but eventually left the residence. Police followed appellant as he left the home and eventually engaged in a pursuit after appellant refused to pull over.

{¶ 13} Based on prior surveillance, investigating officers knew the only other likely occupant of the house after appellant's departure would be the homeowner of record, Artesha McBride.  Officers used a door ram and forced entry and secured the premises.

{¶ 14} A search of the home revealed evidence in multiple locations. In the kitchen, officers found a quantity of heroin in a box beneath the kitchen cabinets. They found crack cocaine in some masonry jars and a large quantity of baggies similar to some later found in appellant's car that would test positive for drug residue.

{¶ 15} In the master bedroom, officers located 71, 30-milligram Oxycodone tablets and a bag containing a large sum of cash. They then located a briefcase containing more cash and numerous car titles, some in appellant's name, others in various names including the name Oliver Smith, an alter ego or alias used by appellant in other documents. In a beverage cooler on the floor, police located 2 kilograms of powder which tested positive for cocaine, and smaller individual bags of heroin and cocaine. In this location, they also located a bag containing 1 pound of methamphetamine. In a dresser, police found approximately one-half pound of marijuana.

{¶ 16} Detective Earl testified the 2010 Honda Pilot driven by appellant on the day of his arrest was registered to McBride, as was another vehicle in the driveway of 854 Antwerp Road. Ultimately, the only vehicle police located that was titled in appellant's real name was an older model silver Nissan Maxima registered to him at 864 South Ohio Avenue, Columbus, Ohio. This was the vehicle identified by the informant and reviewed in the LPRD search.

{¶ 17} The contents of appellant's wallet at the time of his arrest included an American Express card in the name of Oliver Smith, a driver's license in the name of Lindora Forrest (appellant's wife), a MasterCard in the name of Oliver Smith, and a Capital One Visa card in the name of Oliver Smith.

{¶ 18} When appellant was arrested, the contents of the Honda Pilot included numerous plastic baggies cut and torn in a manner typical of drug packaging and containing drug residue. These baggies were similar in size and color to those located in the kitchen of 854 Antwerp Road.

{¶ 19} Detective Earl also testified regarding recorded phone calls made by appellant from the Franklin County Jail. Detective Earl testified he had spoken with appellant and was able to identify appellant's voice in the recordings. Plaintiff-appellee, State of Ohio, played the recordings in open court, and submitted the corresponding transcripts into evidence.

{¶ 20} In the recorded jailhouse calls, appellant complained to his wife that he had no money because police had taken it all, along with his car titles. When his wife mentioned the sum of $500,000 in the same conversation, appellant responded "[i]t is what it is." (Audio Tr. at 15.) Appellant also complained that some of his clothes and things were at the Antwerp Road house, along with his adult son's clothes.

{¶ 21} Detective Earl testified regarding the exact sums of money seized from appellant's person and from 854 Antwerp Road. These included $233,334 in the master bedroom, $209,550 in a briefcase also containing car titles, and $8,208 on appellant's person at the time of his arrest, including $280 identified as the recorded bills from the controlled buy. Detective Earl also described a Federal Express Corporation ("FedEx") package he found on the kitchen table at 854 Antwerp Road addressed to appellant at that address.

{¶ 22} On cross-examination, Detective Earl testified the controlled buy took place at a location near Livingston Avenue and Courtright Road, approximately two miles from the Antwerp Road house. He explained the investigating officers focused on the 854 Antwerp Road address rather than the 864 South Ohio Avenue address where appellant's known and owned Nissan Maxima was registered, because they saw very little evidence of activity or connection between appellant and the 864 South Ohio Avenue address.

{¶ 23} Detective Earl specified it was not unusual for large-scale drug dealers to operate from locations with very little foot traffic representing small-buy deals, and he did not find it inconsistent that surveillance had revealed no such traffic at 854 Antwerp Road. Detective Earl confirmed that investigators found no connection between appellant and the utility services at 854 Antwerp Road, or any other indication of ownerships or possessory interest. He confirmed that surveillance had never observed appellant bringing the boxes or bags, in which contraband and currency were found, into or out of 854 Antwerp Road.

{¶ 24} On cross-examination, Detective Earl conceded that nothing in appellant's wallet on arrest linked him with 854 Antwerp Road. He also stated that, among the paperwork obtained when searching 854 Antwerp Road, in the briefcase also containing large sums of cash, was an auto title for appellant residing at 864 South Ohio Avenue, several others with different names for that address, a paystub or W-2 form for appellant,

various Ohio automobile registrations in appellant's name, as well some as in the name of Oliver Smith, Forrest, and McBride.

{¶ 25} On re-direct, Detective Earl described other items found in appellant's wallet at the time of his arrest: a Tennessee identification card in the name of Oliver Smith, and documents pertaining to Kimaco Auto Sales Company, also bearing appellant's name.

{¶ 26} Detective Earl testified the total seizure of cocaine at the Antwerp address was over 3.5 kilograms. The total seizure of heroin at the address was approximately 1,000 grams, and the total seizure of methamphetamine was approximately 450 grams.

{¶ 27} Detective Grinstead testified regarding his role in the investigation and arrest of appellant. At the time that Detective Earl was supervising the controlled buy, Detective Grinstead was observing the Antwerp Road residence from an unmarked van parked approximately one block away. Before the time for the arranged buy, Detective Grinstead observed several vehicles in the driveway of 854 Antwerp Road. One was a Honda Pilot, eventually driven by appellant, the other was a GMC Envoy. Based on prior surveillance, investigating officers believed appellant would be operating a Nissan Maxima, which they did not observe at 854 Antwerp Road at that time. Detective Grinstead did not observe the Honda Pilot leave the Antwerp Road residence prior to going to assist at the buy location. He did observe the Honda Pilot, with its previously verified license plate, appear at the buy location driven by appellant. After appellant left the buy location, officers attempted to follow but soon lost sight of the vehicle because of appellant's erratic driving. Detective Grinstead then went directly back to his surveillance position at 854 Antwerp Road and observed the Honda Pilot arrive driven by appellant, who got out of the car and entered the front door using keys. Detective Grinstead was able to clearly identify appellant by using binoculars.

{¶ 28} While waiting for the warrant, Detective Grinstead continued his surveillance and observed appellant leaving 854 Antwerp Road. He also observed a woman driving repeatedly around the block and speaking on her cell phone. He assumed this was McBride, the resident of the home, and that she was to some extent aware or suspicious of the related police activity. After appellant left 854 Antwerp Road, officers made their forced entry and began to search the home. Among the items taken, Detective Grinstead identified

a duffle bag containing men's clothing, accessories, and toiletry items. It also contained four large banded bundles of cash.

{¶ 29} On cross-examination, Detective Grinstead stated that although he could not state so with certainty, it was approximately 30 minutes to 1 hour from the time appellant arrived at 854 Antwerp Road after the controlled buy until appellant left the premises. At that time, investigators called for a marked cruiser to pursue and arrest appellant. Prior to the investigation commencing about one month before the arrest, Detective Grinstead had no information regarding appellant as a high profile or significant drug dealer.

{¶ 30} The next witness was Detective Ronald Casto, a full-time firefighter with the city of Whitehall, also commissioned as a police officer with the Whitehall SWAT Team. He testified regarding his role in the investigation and arrest. On the day of the controlled buy, Detective Casto drove one of the tailing vehicles which followed, but then lost, appellant following the controlled buy. He accordingly went to 854 Antwerp Road, where he found appellant had already returned driving the Honda Pilot. He was one of several vehicles involved in the pursuit after appellant left 854 Antwerp Road, and radioed for a marked vehicle to attempt the stop, whereupon appellant fled. After marked vehicles were well engaged in the pursuit, Detective Casto stopped to examine something that appeared to have been thrown from the window of appellant's vehicle. This turned out to be a man's hat containing no useful evidence. Having been distanced by the pursuit, Detective Casto returned to 854 Antwerp Road. He participated in the search and photographic record of the evidence found. He authenticated various seized drugs and established a chain of custody for the items returned to Whitehall Police headquarters for examination and testing.

{¶ 31} Patrolman Colton Stock of the Whitehall Police Department testified regarding his role in the pursuit and arrest of appellant. He authenticated and described the police dash-cam video that depicted appellant driving through yards, striking other vehicles, and speeding to evade pursuit. The duration of the chase was approximately 12 minutes. The vehicle eventually stopped because of tire damage. At this point, appellant exited the vehicle and surrendered without undue resistance. Patrolman Stock secured the evidence, including small quantities of cocaine, heroin, and packaging materials, into an evidence bag. Appellant had approximately $8,000 cash on his person.

{¶ 32} Officer Jon Buerkel testified regarding his actions in accompanying Patrolman Stock on the day in question, corroborating Patrolman Stock's account of the pursuit and apprehension of appellant.

{¶ 33} Detective Stephanie Habecker of the Franklin County Sheriff's Office testified to authenticate the telephone recordings of appellant's jailhouse calls.

{¶ 34} Travis J. Worst testified for the state regarding chemical analysis of the drugs recovered in the case. Worst, currently an instructor at Bowling Green State University, was previously a forensic scientist at the Ohio Bureau of Criminal Investigation. The items tested included packaging residue taken from the home and appellant's car, small quantities of individually packaged heroin and cocaine, and bulk quantities, including heroin, cocaine, methamphetamine, and oxycodone pills, which were found to be genuine rather than counterfeits produced by pill press.

{¶ 35} Possession of a controlled substance may be actual or constructive. *State v. Saunders*, 10th Dist. No. 06AP-1234, 2007-Ohio-4450, ¶ 10, citing *State v. Burnett*, 10th Dist. No. 02AP-863, 2003-Ohio-1787, ¶ 19, citing *State v. Mann*, 93 Ohio App.3d 301, 308 (8th Dist.1993). A person has actual possession of an item when it is within his or her immediate physical control. *State v. Norman*, 10th Dist. No. 03AP-298, 2003-Ohio-7038, ¶ 29; *State v. Messer*, 107 Ohio App.3d 51, 56 (9th Dist.1995). "Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Wolery*, 46 Ohio St.2d 316, 329 (1976). "Circumstantial evidence alone may be sufficient to support the element of constructive possession. Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, constitute evidence from which the trier of fact can infer whether the defendant had constructive possession over the subject drugs. The mere presence of an individual in the vicinity of illegal drugs is insufficient to establish the element of possession, but if the evidence demonstrates the individual was able to exercise dominion or control over the drugs, he or she can be convicted of possession." (Internal citations omitted.) *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 28 (10th Dist.).

{¶ 36} As set forth above, the prosecution presented three types of evidence to demonstrate appellant's connection with 854 Antwerp Road and the drugs recovered

therefrom. Police testimony established that appellant's Nissan Maxima, registered in his name, had repeatedly parked there in the evening hours. Police also observed appellant arrive at the controlled buy location in a Honda Pilot moments before parked on Antwerp Road. After the controlled buy, police observed appellant return to 854 Antwerp Road in the Honda Pilot and enter the property with a key. Appellant left Antwerp Road again in the Honda Pilot, and in possession of drugs and drug packaging materials.

{¶ 37} Upon searching 854 Antwerp Road, police discovered a FedEx package addressed to appellant. In a briefcase with large quantities of cash, police found appellant's personal papers, including car titles in his name or under an alias he commonly used. Police found a bag containing men's clothing on the premises, and appellant's subsequent jailhouse telephone conversation indicated he was keeping clothing for himself and his son at the home. Appellant's jailhouse telephone conversations also bemoaned the loss of his money in the police seizure, indicating the cash on the premises belonged to him. Although appellant's answer in the same conversation was indeterminate, his wife clearly remonstrated him about leaving identifying paperwork at the Antwerp Road residence.

{¶ 38} The jury could reasonably conclude appellant was using the Antwerp Road residence, and its large stash of drugs and cash, as his base of operations leading to the controlled buy, since appellant inferentially left from the address to go to the buy location and, under direct observation from police, returned there immediately afterwards. Shortly thereafter, appellant was arrested in possession of marked money from the controlled buy. Appellant's control of the Honda Pilot vehicle, related to the address through record ownership, further indicated control over the premises. This evidence, if believed, supports a jury verdict that is not against the manifest weight of the evidence with respect to the charges involving drugs seized at 864 Antwerp Road. Appellant's fourth assignment of error is accordingly overruled.

{¶ 39} Appellant's third assignment of error asserts the trial court abused its discretion in replacing a tardy juror with an alternate during the course of trial. The replacement occurred on the second day of trial. At the close of the previous day's session, the court stated that jurors should be prepared to resume proceedings the next day at 9:00 a.m. When court resumed at 9:32 a.m. the next day, the court notified an alternate that he would replace juror No. 7. The court gave no explanation for the substitution at that time.

During a subsequent break at 10:53 a.m., the court stated for the record that the original juror No. 7 had called at 9:00 a.m. to advise courthouse staff that she had just woken up. The court stated that it "did not wish to wait on her to get down to the courthouse," and so had placed alternate No. 1 as the new juror No. 7. (Tr. Vol. II at 362.) Defense counsel objected to the replacement on the basis that this reduced the jury to a single African-American member. The trial court overruled the objection, opining that even a single minority juror met the standard under *Batson v. Kentucky*, 476 U.S. 79 (1986).[1]

{¶ 40} The state argues on appeal that appellant must meet a plain error standard with respect to this assignment of error because no objection was made at the time of substitution, and defense did not raise an objection until substantial testimony had been presented in front of the reconfigured jury. The state argues the defense had ample opportunity to object at the outset of the day's proceedings, and in several intervening sidebar conferences. Appellant argues to the contrary there was no real opportunity to raise an objection until the trial court explained the substitution at the subsequent break.

{¶ 41} Assuming, arguendo, that appellant's trial counsel objected at the first available opportunity, and that accordingly the plain error standard need not be invoked, we still find no error on the part of the trial court in ordering substitution of an alternate juror for the tardy juror. Replacement of a juror with an alternate lies within the sound discretion of the trial court: "[T]he trial judge, in his sound discretion, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir.1972). R.C. 2945.29 provides that when a juror, before conclusion of trial, "becomes sick, or for any other reason is unable to perform his duty, the court may order him to be discharged." Crim.R. 24(G)(1) provides, in part, that "alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." The trial court's exercise of discretion in removing a juror will not be disturbed absent a showing of bias or prejudice to the defendant. *State v. Coleman*, 37 Ohio St.3d 286 (1988); *State v. Frances*, 10th Dist. No. 93APA10-1459 (Aug. 4, 1994), citing *United States v. Smith*, 550 F.2d 277, 285 (5th Cir.1977).

---

[1] Appellant does not argue under *Batson* on appeal.

{¶ 42} While appellant argues that mere tardiness by the original juror does not indicate she was unable to perform her duties, the trial court was not required to accept an indefinite delay in proceedings, given the uncertainties in the arrival time of a juror who had declared she had just woken up at the time when the judge had previously ordered the jury to be present and ready for trial. *See generally State v. Gleason*, 65 Ohio App.3d 206, 210 (1st Dist.1989). Nor can appellant articulate any apparent or presumed prejudice from the substitution. We accordingly find no abuse of discretion on the part of the trial court in resuming trial with an alternate, rather than delaying proceedings until juror No. 7 should appear. Appellant's third assignment of error is overruled.

{¶ 43} Appellant's first assignment of error asserts the trial court erred in denying his motion for a new trial, which was prompted by the disappearance of 71 Oxycodone pills on the final day of trial, possibly during jury deliberations. Appellant asserts that, although he cannot affirmatively demonstrate the exact circumstances under which the pills disappeared, the high probability that one or more jurors were responsible for the disappearance of the pills establishes a presumption of juror misconduct and, therefore, a violation of appellant's constitutional rights.

{¶ 44} Appellant's counsel filed his motion for new trial on July 28, 2017 asserting the presumed mishandling or theft of the oxycodone pills by one or more jurors had raised a strong presumption of juror misconduct or bias, given the likelihood of a juror rushing deliberations in order to avoid detection of the pill theft. The state responded that it was mere speculation that a juror had taken the pills and proposed that the pills had simply been misplaced, erroneously thrown out by the cleaning crew after hours, or otherwise disappeared in a less-than-nefarious way that would not have impacted the jury. The court held a hearing on the new trial motion and considered testimony and documentary evidence before denying the motion.

{¶ 45} Evidence heard at the hearing generally established the following timeline. At the conclusion of the state's case-in-chief, the assistant prosecuting attorney requested admission of various exhibits, including much of the drug evidence in the case. This included a sealed envelope containing 71 Oxycodone pills. The assistant prosecutor requested some of these exhibits, including the Oxycodone pills, go back with the jury for use in jury deliberations. The various items were placed together in a larger box for this

purpose. The court instructed the jurors not to open any of the sealed bags containing drug evidence. During deliberations, the jury asked for permission to open an exhibit containing empty sandwich baggies taken from 854 Antwerp Road to better compare them with the baggies taken from appellant's person at his arrest. The court specifically allowed the jury to open this exhibit only.

{¶ 46} The jury returned guilty verdicts after 5:40 p.m. on July 20, 2017. The bailiff gathered the evidence from the jury room, noticing the jurors had already placed the individual items back into a large box. The bailiff presented the box of evidence to the assistant prosecutor, who placed it in the prosecutor's secured evidence room in the courthouse. The next morning, July 21, 2017, the same assistant prosecutor retrieved the case evidence and conducted a detailed inventory, discovering that the Oxycodone pills were missing. The assistant prosecutor then retraced his path from the previous day, searching the jury room and courtroom, without finding the pills. During the course of this search, the prosecutor spoke with the bailiff, who stated nothing had been found in the jury deliberation room other than the jurors' notes, which were duly shredded, and a loose document. At this time, the assistant prosecutor notified the trial court and defense counsel of the situation.

{¶ 47} The Franklin County Sheriff's Office assigned Sergeant Bill Duffer to investigate the disappearance of the pills. Sergeant Duffer's report was admitted as an exhibit in the trial court's hearing on the motion for a new trial, and Sergeant Duffer provided direct testimony. Sergeant Duffer interviewed the assistant prosecutor in the case, Daniel Stanley, and the bailiff, Sarah Brandon. Sergeant Duffer also reviewed the physical location and security of the jury room, and checked swipe-card records from the prosecutor's office premises.

{¶ 48} Sergeant Duffer's report determined that bailiff Brandon had not inventoried the evidence at the time it was placed on the table in the jury deliberation room, and during the deliberations the jury took two breaks and the room was left open. At no time did all jurors leave the room at once, or any single juror remain in the room alone. After delivering the verdict, the jurors were escorted back to the deliberation room, where the evidence had remained, to gather their belonging. After their departure, the bailiff gathered up the

evidence and presented it to the assistant prosecutor in the case. Later that night, the deliberation room was cleaned by a contracted janitorial service.

{¶ 49} Sergeant Duffer examined video surveillance from outside the courtroom and deliberation room and saw nothing useful. He obtained the door access report for the secured prosecutor's room on the sixth floor, and determined that assistant prosecutor Stanley was the only person to access that room during the pertinent period.

{¶ 50} Sergeant Duffer then interviewed each member of the jury; all denied any involvement in the missing evidence or knowledge of the missing evidence. Based on the jurors' statements, it appeared that no member of the jury would have been alone with the evidence in the deliberation room at any time. Interviews with the members of the cleaning crew yielded no further information.

{¶ 51} Sergeant Duffer noted that all jurors were willing to take a polygraph, but he concluded this was unnecessary.

{¶ 52} Appellant moved for a new trial under Crim.R. 33(A)(2): "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: * * * (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state." A new trial shall not be granted on this or any other of the allowed grounds of Crim.R. 33 "unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial." Crim.R. 33(E)(5). In addressing claims of juror misconduct, the court therefore must employ a two-step analysis. First, the court will determine whether juror misconduct occurred, and second, if juror misconduct is found, the court will determine whether the misconduct materially affected the defendant's substantial rights. *State v. Taylor*, 73 Ohio App.3d 827, 833 (4th Dist.1991); *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 35 (10th Dist.) The party complaining of alleged juror misconduct must establish prejudice. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 42. Crim.R. 33(A)(2) motions must be supported by affidavit as required by Crim.R. 33(C). *State v. Gibson*, 10th Dist. No. 10AP-1047, 2011-Ohio-5614, ¶ 39. "A trial court does not abuse its discretion by denying a motion or a hearing on such motion for new trial on Crim.R. 33(A)(2) grounds if no affidavits are submitted with the motion." *Id.* at ¶ 40, citing *State v. Tolliver*, 10th Dist. No. 02AP-811, 2004-Ohio-1603, ¶ 118.

{¶ 53} Initially, we note that, although Crim.R. 33(A)(2) motions should be supported with an affidavit, the trial court expressly noted the absence of such an affidavit in the present case but, nonetheless, proceeded with the hearing, apparently accepting that Sergeant Duffer's sworn testimony provided the requisite evidentiary basis to examine the issues raised.

{¶ 54} On the facts developed at the hearing, we find the trial court did not abuse its discretion in determining that no juror misconduct had been shown, and that if juror misconduct were present, no prejudice to appellant resulted. While malfeasance by one or more members of the jury could not be ruled out, other possibilities, such as the cleaning crew discarding an otherwise unremarkable manila envelope with the trash, could not be ruled out; nor could mishandling by the assistant prosecutor or bailiff before or after in-court trial proceedings be ruled out. Even assuming, arguendo, that a juror surreptitiously took the pills, there is no indication, given the evidence in the case, that the jury unduly hastened its deliberations in order to accommodate such a juror's desire to consummate his or her crime. The jury deliberated for nearly three hours in a case in which, as we have already found, the manifest weight of the evidence established appellant's guilt.

{¶ 55} On appeal, appellant argues for the first time that trial counsel should have moved for a new trial under Crim.R. 33(A)(1), irregularity in the trial proceedings that prevented defendant from having a fair trial. Appellant's arguments in support of this different ground for a new trial raise no material issues not already raised in connection with the motion under Crim.R. 33(A)(2), and thus provide no additional basis for reversing the trial court's decision.

{¶ 56} In summary, we find the trial court did not abuse its discretion in denying the motion for a new trial, and appellant's first assignment of error is accordingly overruled.

{¶ 57} Appellant's second assignment of error asserts he was denied the effective assistance of trial counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate his trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The defendant must then establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶ 58} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.*, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). A verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel. *State v. Hester*, 45 Ohio St.2d 71, 75 (1976).

{¶ 59} Appellant raises two grounds for this on appeal. First, appellant argues trial counsel should have argued under Crim.R. 33(A)(1) in addition to 33(A)(2) in his motion for a new trial. As discussed above, reframing the argument under the different subsection adds nothing to the discussion of the issues on appeal, nor would this have likely affected proceedings at the trial court's hearing on the motion for new trial. In addition, appellant argues that appellate counsel had great difficulty obtaining trial counsel's file when preparing the appeal. The standard for ineffective assistance of trial counsel addressed conduct that would have affected the outcome of the case *at trial*. While trial counsel's purported reluctance to share his files with appellate counsel raises other questions, it is not properly argued under an ineffective of assistance of trial counsel standard.

{¶ 60} Appellant has not demonstrated that he failed to receive effective assistance of trial counsel, and his second assignment of error is overruled.

{¶ 61} Appellant's fifth assignment of error asserts that, to the extent we find no prejudicial error in the issues raised in the first four assignments of error, cumulative error deprived appellant of a fair trial under *State v. DeMarco*, 31 Ohio St.3d 191 (1987), and *State v. Moore*, 81 Ohio St.3d 22 (1998). Having found no error in the trial court's decisions, there is no basis to cumulate non-prejudicial error to find cumulative error in this case. Appellant's fifth assignment of error is overruled.

## IV. Conclusion

{¶ 62} In conclusion, appellant's five assignments of error are overruled, and the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

KLATT, P.J., and SADLER, J., concur.

———————————